You may begin when you're ready. Good morning. May it please the Court. Tracy Ickes, appearing on behalf of the appellant, Ms. Kay Lynn Dana, who is present with us today. I would like to reserve five minutes of my time for rebuttal. Ms. Dana is a transgender woman with gender dysphoria, and she appeals from the dismissal with prejudice of her Second Amendment complaint, which generally alleged violations of the Eighth and Fourteenth Amendments. While she was incarcerated by the Idaho Department of Corrections. The District Court's misapplication of the concept of group pleading led it to make reversible errors in its analysis of the complaint's plausibility and of the requirements of Section 1983. To start, I want to turn to two basic principles, and for now I'm going to set aside the claims against Defendants Ivancho and Taylor. First, Defendants' motion to dismiss was brought under Rule 12b-6, and so Ms. Dana's factual allegations must have been taken as true. And second, collective allegations, or group pleading, I believe this Court has used both terms, are permissible so long as Defendants have notice of what they are alleged to have done. So starting with the first, taking factual allegations is true. This is true even when allegations are collective, by which I mean they refer to a group of Defendants who are all alleged to have engaged, or in this case, failed to engage, in the same conduct. The Defendants have not cited a single case in which collective allegations were disregarded merely because they were collective. And this is because the plausibility analysis under Rule 12b-6 takes the allegations as true, and then asks whether entitlement to relief has been shown. And if it were otherwise, no case could ever use allegations that were collective and state a claim this Court could not have reached its decisions in Solingo and Swobeth. Here, though, the Defendants convinced the District Court it was not plausible that they all did the same thing. Let me ask you, because I am having trouble trying to figure out the plausibility alleged that the individual Defendants had sufficient culpable mental state for any of the claims that are brought forward. I understand you can bring group claims, but you have to be able to allege the plausibility to identify all of the different factors related to the individuals. And where in the second amended complaint do you allege how the health care Defendants are liable, independent from their liability, as the MTC or the grievance form Defendants? I'm just having trouble figuring that out. I hope I can help you with that, Your Honor. Thank you. First, I will say there is just one health care Defendant on this appeal who is not also what we've called an MTC Defendant, a member of the Management and Treatment Committee, and that one health care Defendant is Elizabeth Adkisson. The allegations regarding Ms. Adkisson are that Ms. Dana directly requested treatment for her for gender dysphoria. She did not receive that treatment. The collective allegations regarding the health care Defendants are that they had no medical basis for denying that treatment to her. Our position is that that collective allegation should have been taken as true, and it's supported by allegations in the complaint that none of the Defendants here followed the WPATH standards for diagnosing gender dysphoria. I'm sorry. Again, it's not clear to me what the health care group did wrong, independent from the other two groups. Did you just say that, what it was? What is it? Well, Your Honor, the health care Defendants are all alleged to have been responsible for rendering medical care to Defendants, and that includes Ms. Adkisson, from whom Ms. Dana directly requested a gender dysphoria diagnosis and treatment, and Ms. Dana received none of that care. Despite the health care Defendants, and I think this is important to answering your question, being on notice of her distress due to all of the health service request forms that she was submitting. I'm not quite sure that's in your second amended complaint, but go ahead. I mean, it seems like several of the MTC Defendants appear to have attended an MTC meeting, but were not recorded as weighing in. For example, I think it was a psych tech, Kaylin Hart. And so I'm trying to figure out what facts in the second amended complaint indicate that Defendants, like Ms. Hart, both recognized the excessive risk to Ms. Dana's health and consciously disregarded that risk. So, Your Honor, the allegations that would be collective here are that each of these Defendants failed to apply clinical diagnostic criteria for gender dysphoria. What renders that allegation plausible is, first, that we have pled the WPAS standards of care, second, that we have pledged that in the available meetings of the MTC, they made up completely different factors that are not recognized under any clinical standard. To say that, well, this Defendant could not have been alleged to have applied those wrong factors because they were not at this meeting, I think is to misunderstand the complaint. Help me out a little bit when you say that they are applying incorrect standards such that we've got deliberate indifference. I mean, what we've got is a number of meetings of this MTC committee, and they discuss the case numerous times. And we have at least one person, Dr. Campbell, who pretty much from the beginning is leaning toward a diagnosis, but the others on the committee disagree. And it's hard for me to see this as deliberate indifference instead of disagreement. Help me out as to why this is deliberate indifference instead of disagreement among the members of the committee. Sure, Your Honor. So for purposes of the Eighth Amendment disagreement, you can show that treatment is medically unacceptable under the circumstances where a medical provider is not qualified, and this complaint alleges that these MTC defendants, with the possible exception of Dr. Campbell, were not qualified or trained to diagnose gender dysphoria. Now, were they medical professionals, and what were their degrees? What do we know about them? Several of them were not medical professionals, and I'm going to pull my site here. I believe that was in paragraph 63 of the complaint. Okay. I'm at 53. It is not 63, but I will find it for you quickly or give it to you on rebuttal because I do want you to have that site, Your Honor. Okay. I mean, are they referred to as clinicians? What does that mean? They are referred to as clinicians. What does that mean? That's simply their job title with Corizon. I think to assume that that means they have any qualifications to assess gender dysphoria would be drawing inferences. Are they medical doctors? Do you know? I believe two of them are. Dr. Campbell is a psychologist, and there's also a doctor, I hope I pronounced it right, Eliason. Other than that, this complaint does not allege that they were doctors. And in the notes of these meetings, we see various things of, well, seemed coached, no indication of clinical distress. I mean, these things, I think, are relevant. Yes, Your Honor. But what the complaint also alleges is that each of these defendants had notice of Ms. Dana's suicidal tendencies. The complaint pleads that she was on suicide watch on multiple occasions. The complaint pleads that each of these defendants had notice of her request for care, and we have attached her health service request forms and her grievance forms. Oh, I read them. I saw them. I read them. She's being very, very clear about the distress she's in. By, I believe it was May of 2019, each of these defendants had received Dr. Etner's report, which said these are the correct standards, and the ones you are applying don't relate at all to the accepted criteria for diagnosing gender dysphoria. I believe that there was some delay after receiving Dr. Etner's report, but within a few months of having received that report, the committee then accepts the diagnosis. Respectfully, Your Honor, I would think a delay of almost six months after that was more than a few months to Ms. Dana. She was suicidal. She was in the utmost distress, and this committee knew it. So for the committee to understand that it's making up criteria, to understand that she is in this level of distress, and to persist and continue to delay the diagnosis, even though they're not seeing a change. And this, I think, is important. When care is delayed and a condition does not improve, maybe, and I'm not saying that was the case here, maybe the first diagnosis was wrong, but when it's allowed to persist without the medical providers changing their position, then it can certainly rise to the level of the literature. Yes, so let me make sure I got the dates. Dr. Edmond's report is transmitted to the members on May the 7th, and it's presented to the committee, I guess, October the 2nd that the diagnosis is confirmed. Do I have those dates right? Yes, you do, Your Honor. Okay. So five or six months. So you have, in the second, I think your argument is second amendment complaint or seems to allege that the 25 individual MTC defendants were deliberately indifferent by failing to reassess Ms. Dana between November 2018 and October 2019. But where does the second amendment complaint plausibly allege that each of those defendants bore responsibility for reassessing her? Your Honor, these defendants were members of the committee that we allege was responsible for rendering a gender dysphoria diagnosis to inmates at our dock. Where in the second amendment complaint, I'm just trying to figure out where you plausibly allege that each of those defendants bore responsibility for reassessing her. So paragraph one of the second amendment complaint says that the Management and Treatment Committee was responsible for making gender dysphoria diagnosis. Each of the paragraphs that identifies the individual defendants identifies the ones that were responsible for the members of this committee. The collective allegations of the complaint identify collectively the MTC defendants had knowledge of Ms. Dana's distress. That means each one of those singular defendants. The complaint alleges that each one of them was applying made-up criteria and that they knew it, certainly by no later than Dr. Edner's report. And again, that is taken to be an allegation as to each one of them. It is though we said defendant A, defendant B, and defendant C as opposed to MDC defendants. It seems, at least on my reading, that you're not alleging who is responsible for reassessing her just that someone in the group should have reassessed her. And so I just wanted to give you an opportunity to direct me where in the complaint that is set out if you think differently. Your Honor, our position is that each one of them was responsible for diagnosing her. If that is ultimately not supported by the facts and discovery would show that one of them was responsible and the others were not, maybe we could flesh that out. But I want to emphasize here we're at the pleading stage with an incarcerated defendant operating with the limited information available to her. What she knows is there's a committee and that that committee is responsible for giving her a diagnosis and that it did not. What do we do with, and I don't see it anywhere in the papers here, is there going to be a qualified immunity defense? Because we're seeking damages now. I mean, she's no longer incarcerated, so the only issue I think is damages. Is there a qualified immunity defense available? Well, our position would be no, Your Honor. Well, with qualified immunity, theoretically on the table, I guess that's my question. If we were to move past the pleading stages and the defendants were to raise that. It's an issue you have to deal with, certainly. I don't think they're going to waive qualified immunity. I'm trying to figure out just what, in the abstract sense is, what claims of qualified immunity would be available to a committee that's accused of having, who is charged with having made an erroneous diagnosis. Well, Your Honor, again, I think it's the individual defendants and not the committee. No, I understand that. Do the individual members of a committee who have made, in your view, an incorrect diagnosis, do they get qualified immunity? In the abstract, whether on the facts of this case, that's not what I'm asking. Maybe you say, well, that's a later question. Okay. This may delay you, but I want to ask about the alleged assault by Geib, which is quite a different proposition. As I read the complaint, your client is on Tier 1, excuse me, I guess Tier 2. Geib is, I don't know if the right word is yet attack, but certainly sexual harassment. Your client asks for a change of tier, which she gets. Geib almost very quickly thereafter has moved on to the same tier, and then there's a sexual attack. You don't name very many people here. You name two. You name Defendant Walton, and you name Lieutenant Purcell, who's not a defendant. But you then say each of the custodial defendants failed to protect plaintiff. Well, that can't be true, that is to say that each, because you've got people who are not even in the same facility that you're alleging know about this. So maybe there's some, but help me out in terms of whether you've alleged enough that we can get discovery that somebody failed in their duty or maybe deliberately allowed access. What we have is an attack. We know from the, or we assume the correctness of the information that Walton and Purcell knew because she reported her concerns and requested to be moved. Now, I don't know who ordered the removal, but we can assume that they did. But help me out as to why that's enough to get past the pleading stage as to that some responsible person improperly allowed Geib access. Well, Your Honor, I think I can help a lot here, and that is there was a shift in the reply brief, and we are not going to be pursuing the failure to protect based on the sexual assault in this appeal. However, that sexual assault. Oh, I totally missed that then. Okay, so that's out of the case. It is in one sense, and that is the claim against Defendant Taylor who forced Ms. Dana to shower in the dark after knowing of her complaints of these sexual assaults and knowing that this would have a very severe psychological impact on her, to use a, I guess, pop phrase. So it is in the case in that sense. I totally missed that you dropped the sexual assault by Geib. Okay. I apologize if I hit it in a footnote. No, no. I just missed it. Okay. Thank you. Thank you. May it please the Court. Michael Zarian on behalf of the Department of Corrections Defendants. Before I get into my answer, I just wanted to address your question, Judge Fletcher, about qualified immunity. Qualified immunity will be a part of this case going forward. I believe there was an issue where Judge Windmill in the screening order wanted qualified immunity to be raised in an early summary judgment motion or something and not in the motion to dismiss. So that will be a part of the case going forward. Absolutely. Am I correct? No one asserted qualified immunity defense? Not at the motion to dismiss stage yet, Your Honor. Okay. Yeah. But I think as the panel has correctly picked up on, at the heart of this case, this case really is a civil procedure case. And after warnings from Judge Nye and Judge Windmill and a blueprint on how to fix the deficiencies in the pleaded complaint, even with sophisticated counsel, Dana filed a second amended complaint that made the shotgun pleading problem worse. The new complaint added more than 20 new defendants, assigned 35 individual defendants into four overlapping groups, and made general allegations against the groups collectively, sometimes lumping several groups together. That type of shotgun pleading violates Rule 8, which is meant to protect courts from having to parse inscrutable pleadings and protect defendants from the unfairness of having to incur the costs of litigation and face the prospect of liability without adequate notice of what they're alleged to have done wrong. Why isn't the cure for that for each one of the defendants for whom they're really into what they just moved to dismiss? Why do you dismiss the entire complaint when, in fact, there may be very plausible allegations against people who are named and against whom there are very specific allegations? I think the answer is, Your Honor, that the allegation, the causes of action are not delineated against any individual person, but against the MTC defendants or health care defendants collectively. But each one of them is named, and as to those who are named as to whom there really is nothing specifically alleged against them, why isn't there the solution for them to individually move to dismiss? Why do we have to dismiss everybody when there are some specific allegations directed at specific people? Yes, Your Honor, so I think Dana has argued that everybody acted in the same way. When the MTC defendants is used, everybody's name should be inserted in that spot. You say that Dana has alleged that everybody acted in the same way. That's not quite right. Now, if you characterize it as collective, if it is collective, that is almost sort of by definition. Everybody acted in the same way. But that's not quite what the complaint says. Well, Your Honor, I think, so there are specific allegations, more specific factual allegations directed to specific people in the facts section, and then you get to the cause of action. And if you were to read the cause of action, it has similar factual complaints but are alleged against everybody. And that makes the complaint self-contradictory and internally inconsistent. So, for example, the complaint later says, the MTC defendants denied Ms. Dana the appropriate diagnosis in November 2018. But the complaint also says that not everybody was at the November 2018 meeting. So it's not a simple matter of taking the people at the November 2018 meeting and carrying it forward. A defendant wouldn't know whether they are alleged to have participated in the November 2018 meeting or not because these are contradictory allegations. And the same thing again, the MTC defendants at the February 2018 meeting focused on questioning her credibility. Well, I get that. So why isn't the solution for those individuals to move to dismiss instead of everybody gets to dismiss? Well, I think the answer is we don't know exactly who acted in which way, and the defendants don't know. And even there's parts— Well, Dr. Campbell said this and so-and-so said that. We've got some of this that actually is attached to people. Yeah, yes, Your Honor. I think that would—I mean, nobody should have to guess whether they are included in the group or not. And so maybe an example is helpful. So in the equal protection claim, there's an allegation that all of the— Actually, I'm much more interested in the action of the committee and the failure to diagnose the deliberate indifference. That's the one I'm interested in. Right, Your Honor. I guess my point is this is how Dana is arguing the complaint should be read is when it says the custodial defendants disciplined Dana for wearing eyeliner, for example. I'm not interested in that. I'm talking about the MTC defendants. I'm talking about the diagnosis or the failure to diagnose, the deliberate indifference complaint. I understand, Your Honor. The example was just that Dana says that it should apply to everybody. When it says that name, it says MTC defendants, we are saying that all of the MTC defendants acted in this way when that phrase is used. But in other parts, it says not all of the MTC defendants. So each defendant is not sure which group they belong in. And it's not a simple matter of carrying specific allegations forward, especially when the allegation is that everybody acted in the same way. Well, you see, that's not the allegation as I read the complaint. I mean, you can tell me it's collective, and then you can tell me the definition of collective allegation is that everybody acted in the same way. But that's because you've attached the word to it of collective. That's not what the complaint says. And I actually don't understand, Dana, to have distinguished in the request, even, to disaffirm as or reverse as to certain defendants. No, I totally take your point. There are parts of this complaint that are total blunderbuss. Everybody in the category did this. But then when you look at the specific allegations that are factual allegations, there's some delineation as to X did this, Y did that. Perhaps, Your Honor, yes. And then it would just be a matter of not knowing where those people fall in the cause of action itself. And then there would be another layer of the Rule 12 problem, which this Court has also picked up on, as not knowing. This looks like disagreement. This looks like difference of medical opinion. It is not a plausible allegation of deliberate indifference of any person who consciously knew that this was the wrong course of action, knew Dana's treatment history, yet chose that in deliberate disregard to an excessive risk that that course of treatment would cause as opposed to a different course of treatment. Let's focus on Dr. Campbell, if we could. According to the second amended complaint, Dr. Campbell knew that Ms. Dana met the gender dysphoria diagnostic criteria in October and November of 2018, received a copy of the report discussing Ms. Dana's suicidalness in May of 2019, and yet the committee did not diagnose her with gender dysphoria until October of 2019. So I guess my question for you, drawing inferences in Ms. Dana's favor, why isn't that enough to plausibly state a claim? Against which defendant, Your Honor? Dr. Campbell. Against Dr. Campbell? Yes. Understood, Your Honor. Well, so Dr. Campbell, in the October meeting, as the notes attached to the complaint make clear, Dr. Campbell said, this is where I'm leaning, I think this is a complicated question, and I invite discussion. As this Court talked about in Edmo, the MTC does not actually make medical decisions and has limited information about medical situations. It's Dr. Campbell who does make the final decision. But Dr. Campbell asked for input from those who see Dana on a more regular basis, received that input, and made a good-faith belief of what the diagnosis should be. And between November 2018 and October 2019, there aren't any allegations of any changed circumstances that would give cause to, there's a complete gap in the pleadings as to what was going, facts on the ground that was happening with Dana that would cause a revisiting of that diagnosis. And that's why the only plausible allegation is that, you know, there was ongoing monitoring as to the course of treatment for various potential mental disorders, such as borderline personality disorder or potential bipolar disorder. And as it became clear that this was not working, the treatment was altered in October 2019. As I read the complaint sympathetically, with respect to the actions of Dr. Campbell and the committee, Dr. Campbell, pretty early on, is leaning toward an appropriate diagnosis. But he allows the committee to persuade him otherwise, or maybe I should say override his judgment. Why isn't that an appropriate allegation of a cause of action, when it appears that Dr. Campbell is the one who has the real professional qualifications, and so far as we can tell, the others do not? Yes, the whole purpose of the MTC is a multidisciplinary committee, where you have people who aren't doctors, you have people who are in charge of security, some people who are social workers, some people who are mental health professionals. That's exactly my point. Right, and I think it is absolutely reasonable, and probably the medically correct way to address this is to get input from those different, those people who have been working with Dana on a daily basis, and get all the information possible before rendering a diagnosis. And I think that's what Dr. Campbell did here, and, you know, under Twombly and Iqbal, I suppose you can imagine a bad faith scenario. Twombly and Iqbal make clear that even if you can imagine a bad faith scenario, that's not enough. There has to be something to make this plausible. So in Twombly, you can imagine it. Who had the ultimate say? Dr. Campbell. He had the ultimate say? That's correct. Dr. Campbell is the final decision maker. But because the others persuaded him not to, you say that there was no, that what's been alleged is not sufficient? I would say that the others gave him information to inform his decision. He came in and said, this is a complicated issue. This is where I'm leaning. This is just from the notes. A complicated issue. This is where I'm leaning, but I invite discussion. And that discussion informed his judgment. Because it seems, and I guess this goes a little bit to what Judge Fletcher was saying, just a little frustrating here, I guess, because it seems like part of the defense, against Ms. Dana's claims, is that decisions are made by committee, as you just stated. And that, therefore, no individual is liable. And I'm just trying to figure out, is that, viewing it that way, is that not always going to be an end run around her Eighth Amendment right to adequate medical treatment? You mean making the decision as a committee? I suppose if there really were a committee of all medical professionals who could all have deliberate indifference because they know sufficient facts about Dana's medical history and knew sufficient, knew enough about the diagnosis to know that this was incorrect, yet choose it intentionally anyways, I suppose there could be some sort of panel where everybody could be deliberately indifferent. But that's not what we have here. And just if you're asking, you know, facts, I understand what's been pled, but if you're asking facts on the ground, is this going to cause a big problem? Well, in Edmo, for example, you see there was one doctor who is the person in charge and the decision maker. And that's, it's not the MTC that makes final decisions. And it generally is not hard to find these prisoner complaints often come forward as a policy or often come forward against the person who treated that inmate specifically. And so it's often not hard to find the person who made the decision. But the way that this complaint has been pleaded has made it sprawling accusations against many people who have many different backgrounds and many different trainings. What's specific against, as to Dr. Campbell? There are some, there are more specific complaints as to Dr. Campbell, but I would still say that at least what the allegations are against Dr. Campbell make it actually look more like good faith than almost any of the other ones. The rationales that have been criticized by Dr. Etner, for example, aren't rationales that Dr. Campbell put forward, that Dr. Campbell uses the exact same language from the WPATH standards, for example. As Your Honor noted, clinical distress, is this being caused by, you know, and gender nonconformity, for example. One thing that gives me pause in response to your argument is that as soon as we get the report coming in from Dr. Etner, all of a sudden the diagnosis changes. Well, maybe it takes a few months. But the report from the outsider and the lawsuit prompts a change in the diagnosis, suggesting to me that, well, Dr. Campbell, in a sense, at least if I'm construing the complaint favorably, Dr. Campbell knew this all along. But he's now got a lawsuit and another professional who's telling him, you know what, you were right. Two things on that, Your Honor. The first would be that the lawsuit has been pending since July of 2018. So that's smack dab in the middle of the offense. Yeah, but it's a pro se lawsuit for a while. We don't get Dr. Etner in here for a while. That's correct, Your Honor. But there's still allegations. There is a pending lawsuit, and that's in his mind that this could be happening. But pro se lawsuits happen all the time. Counseled lawsuits, as this later became, with a report from a nationwide expert, that's a different proposition. And when that happens, all of a sudden Dr. Campbell says, oh, I guess I was right. Sure, Your Honor. And on that point, my response would just be that this is still just the only fair way to read this as a difference of opinion. And treatments often change over time. And you can see, Doctor, that there were a lot of possibilities as to what this is going to be. Hormone treatment is something that's very serious, and trying some of these other mental health strategies first is a completely reasonable decision. Even the WPATH standards recommend delaying at least six months of sustained clinical distress before making a decision. So waiting and seeing how these other things play out, I think, is by far extremely rational, and we don't have anything rising close to the sort of deliberate indifference. But waiting for things to play out when we have repeated statements of I am suicidal. Waiting for things to play out when someone says I am suicidal, that's a pretty risky way to proceed. Well, I wouldn't say waiting to play out. When I say waiting to play out, I don't mean doing nothing, I guess is what I'm saying. But nothing was done. That is to say they talked a lot, but that's the only thing that happened. Actually, in the complaint, Your Honor, there are quite, in response to these health service requests, you can see that the doctors are saying I am seeing Dana today. Dana is being seen daily. And so there is constant, even by the allegations of the complaint, there is constant ongoing medical treatment. The only thing that is alleged to not have been done for a long period of time is a revisiting of the clinical diagnosis, not of any treatment at all. And so what I'm saying. Well, not of any treatment. Is seeing Ms. Dana treatment? I mean, she's asking for certain forms of treatment, none of which is provided. They keep talking to her, and they keep saying we're not going to give you the diagnosis. I guess I think higher of psychotherapy, Your Honor, in that these discussions with Dana are meant to address many of the underlying theories of what was going on with Dana at the time of bipolar disorder or borderline personality disorder, or some of these other disorders that you see them discussing in the notes at the MTC meeting. And that's what those meetings are about, not necessarily just meeting at the MTC. According to the Second Amendment complaint, three clinicians, Stewart, Clark, and Boggs, spoke up to individually oppose a gender dysphoric diagnosis after Dr. Campbell indicated that Ms. Dana met the diagnostic criteria. Would that be enough to plausibly state a claim? I would say no, Your Honor. And some of these doctors were not at all of the meetings. Some of these doctors, there's not enough to know what these doctors knew about Dana or knew about the diagnosis and had to know that it was wrong. These people come from all different backgrounds, work from different facilities across the state, and we just have almost no information about their background. And that's compounded on top of the group pleading problems, where it's not exactly clear what is alleged to have been done by those specific. There are certain comments you could, but there's other allegations that these defendants wouldn't know if they're being attributed to those people or not. No other questions we ask that the Court would affirm. You were out of time, but we went over time here, so I'll give you two minutes. I appreciate that. Thank you very much, Your Honor. I want to quickly address a couple things. The first is much of this discussion with counsel has gone beyond the scope of the complaint. We've now learned that Dr. Campbell is the one who makes the diagnoses. That's very helpful information. But as Your Honor noted, we do have other clinicians who were speaking up at these meetings, and for the allegations that they did not have training in gender dysphoria, I would refer the Court to paragraph 108 of the second amended complaint. That's the site I promised. Unless the Court has other questions. I do. Yes. Looking in the briefing in this case, I did not see you asking us to send this case back for a chance to amend. Did you request that in your brief? Your Honor, we requested reversal of the dismissal with prejudice to the extent that with prejudice would request an opportunity to replete. I think that would be appropriate. I would point out that counsel mischaracterized the number of attempts to amend. This was a pro se complaint. There was one complaint filed by counsel, a motion for leave to file a second amended complaint, but the district court said it did a good job of answering its concerns. So to suggest that this complaint has seen repeated iterations that ignored the district court, I think mischaracterizes the record. I would also say that if counsel was truly confused, they could have moved for a more definite statement, that dismissal with prejudice was perhaps overreaching in terms of the remedy for this. And lastly, as to the suggestion that they could not answer this complaint, Rule 8 does allow defendants to answer within their knowledge and deny knowledge as to the rest. So if one paragraph arguably refers to multiple defendants, Defendant Campbell could answer as to himself and deny knowledge as to any of the other MTC defendants if that was in fact true. So answering the complaint in its form is possible. Amending the complaint would also address the concerns without the draconian remedy of dismissal with prejudice. All right. So to get back to my question, then, if we don't give you exactly what you want, you still would like another chance to go back before the district court and have a third amended complaint. Is that correct? I don't think it's necessary, but yes, of course, we would like that opportunity. I mean, let's say that's what I think should happen in this case, if anything. I assume you would like that lifeboat rather than no lifeboat. Absolutely. Okay. All right. Thank you, Your Honor. Thank you, Ms. Ickson. Mr. Zarian, I appreciate and we all appreciate the oral argument presentations here today. The case of Kay Lynn Dana v. Idaho Department of Corrections is now submitted. And that concludes our docket for today. So we will be adjourned. Thank you very much.
judges: MURGUIA, FLETCHER, OWENS